Karen S. (Topper) SPIVEY, Appellant–Petitioner,

v.

Charles E. TOPPER, Appellee– Respondent.

No. 65A04–0703–CV–134.

Court of Appeals of Indiana.

Nov. 20, 2007.

Donald E. Baier, Baier & Baier, Mount Vernon, IN, William W. Gooden, Mount Vernon, IN, Attorney for Appellant.

Beth Ann Folz, McFadin Higgins & Folz, Mount Vernon, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Karen Spivey is disabled to an extent that she cannot support herself. Consequently, the trial court ordered Charles Topper, Karen's ex-husband, to pay spousal maintenance for a finite period of time—six months. Karen's treating physician, however, provided undisputed testimony that he could not say that the new medications she had recently begun taking would enable her to be employed in six months. Under these circumstances, we find, among other things, that the trial court abused its discretion by awarding spousal maintenance for a predetermined, finite period of time.

Appellant-petitioner Karen S. (Topper) Spivey appeals from the trial court's decree of dissolution of her marriage to appellee-respondent Charles E. Topper. Karen argues that the trial court erroneously (1) found that she was incapacitated but capped the length of the spousal maintenance award at six months and awarded her an insufficient amount of maintenance, (2) credited Charles for the parties' debts to his parents and uncle, (3) valued the marital residence at $72,000, and (4) awarded Karen only 54% of the marital estate. Finding that the trial court abused its discretion in awarding spousal maintenance for a finite amount of time and finding no other error, we affirm in part, reverse in part, and remand with instructions consistent with this opinion.

### FACTS

Karen and Charles were married on July 26, 1993, and Karen filed a petition to dissolve the marriage on March 15, 2005. There were no children born of the marriage. At the September 12, 2006, hearing, it was established that Charles was employed at General Electric and earned approximately $70,000 per year. After deductions for child support payments for his children from a previous marriage, taxes, healthcare, life insurance, long-term disability insurance, and his retirement plan, Charles's average weekly take-home pay was $550. Charles continued to pay the parties' debts and paid for a majority of Karen's living expenses after Karen filed the petition for dissolution. During the pendency of the divorce proceedings, Charles lived with his parents because he could not afford to live by himself. He also had to borrow money from family members "because he had more money going out than coming in." Appellee's Br. p. 3.

Karen's treating physician, Dr. Kyle Rapp, testified that Karen suffered from connective tissue disorder, bipolar disorder, hypertension, and chronic obstructive pulmonary disease. Furthermore, Dr. Rapp testified that Karen was disabled by the combination of her connective tissue and bipolar disorders. Both conditions are treatable, and Dr. Rapp stated that Karen had been responding to recent medications.

On November 29, 2006, the trial court entered a decree of dissolution that provided, in relevant part, as follows:

12. The Wife has two major medical conditions at this time namely a.) a Bi-polar disorder, for which she begun [sic] treatment [on] September 6, 2006, and for which she takes the pharmaceutical "Zyprexa" and b.) she has an autoimmune, or connective tissue disorder, which may be

Lupus. She began treatment for this disorder [on] July 26, 2006.

13. The Wife is currently disabled from employment as a result of the combination of the two diseases, the connective tissue disorder limiting her ability to perform physical labor, and the bi-polar disorder preventing her from successfully interacting with other employees in an office environment.

14. Both conditions are treatable and the Wife's disability may continue for 3 months, 6 months, a year or longer. For these purposes the court finds she will be disabled for a period of six months. She has not become eligible for Medicaid, but at the time of the hearing had not applied for social security disability benefits, even though she claims to be totally, and permanently disabled.

\* \* \*

16. The inability of the wife to be gainfully employed in the foreseeable future rebuts the presumption of equal distribution of the marital property.

\* \* \*

20. The Court having found the Wife disabled from gainful employment for a period of six months, the Husband is ordered to pay to the Wife the sum of $200.00 per week, payable every Friday for a period of 26 weeks. . . .

Appellant's App. p. 80–84. Karen now appeals.

## DISCUSSION AND DECISION

### I. Spousal Maintenance

■ Karen contends that the trial court erroneously limited the period during which she is entitled to maintenance stemming from her incapacity to six months. The trial court's power to award spousal maintenance is wholly within its discretion, and we will reverse only when the decision is clearly against the logic and effect of the facts and circumstances of the case. *Augspurger v. Hudson*, 802 N.E.2d 503, 508 (Ind.Ct.App.2004). "The presumption that the trial court correctly applied the law in making an award of spousal maintenance is one of the strongest presumptions applicable to the consideration of a case on appeal." *Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1174 (Ind.Ct. App.1995).

Indiana Code section 31–15–7–2(1) provides that

[i]f the court finds a spouse to be physically or mentally incapacitated to the extent that the ability of the incapacitated spouse to support himself or herself is materially affected, the court may find that maintenance for the spouse is necessary *during the period of incapacity*, subject to further order of the court.

(Emphasis added). The issue herein, therefore, is whether the trial court abused its discretion in finding that Karen's incapacity would last for a finite amount of time, namely, six months.

Dr. Rapp testified that the combination of bipolar disorder and connective tissue disorder prevented Karen from supporting herself because the bipolar disorder prevented her from interacting with people and the connective tissue disorder prevented her from engaging in manual labor, including such tasks as stuffing envelopes. Appellant's App. p. 38–40. Karen had begun new treatments for her conditions shortly before the September 20, 2006, deposition. Specifically, she began taking a new medication for her bipolar disorder on August 16, 2006, *id.* at 62, and a new

medication for her connective tissue disorder on July 26, 2006, *id.* at 66. Dr. Rapp testified a number of different times that he needed more time to evaluate the efficacy of the new treatments:

With something like this, maybe in three months we would have it under control, and maybe we wouldn't. I mean, are there bipolars who work? Absolutely. Are there lupus patients who work? Absolutely. But at the same time, there's some that don't or that are disabled because they don't respond to the medicine. Until you, you know, give them a trial, it's just hard to say for sure, and there's not just one medicine that's the medicine that works for everybody. I mean, it's trial and error to find the medicine that that patient responds to.

*Id.* at 40. With respect to the bipolar disorder, Dr. Rapp testified that he can generally tell that a new medication is working:

pretty quick[ly]. For stabilization, minimum of three months, usually closer to six months to make sure they don't have any manic spells, which is the main thing it's controlling at that point. But usually they'll have a pretty quick response early such as the mood irritability and the racing thoughts seem to come under effect pretty quick, which is why, you know, a couple weeks on, you know, I said she was showing some signs of stabilization. But three to six months, you know, to make the determination, you know, that the medicine is really at the right dose.

Q. Okay. And would it be fair to say that she has shown improvement in—

A. She has shown improvement.

Q. —irritability, mind racing, too much energy, and insomnia in that period of time?

A. Yes.

Q. So is it possible that once this medication is stabilized or she receives treatment for that three to six months that she may not be disabled by her bipolar?

A. Possibly. Possibly.

*Id.* at 63. With regard to the new treatment for her connective tissue disorder, Dr. Rapp testified as follows:

Q. And when would you expect to see results from that treatment?

A. Like I said earlier, we've already seen some. We've seen results. She's not in as much pain. She's not having the swelling and problems that she was having before. But that one's going to be a much more difficult one to get a hold on because [of] the way the medicines work. There's much more trituration involved with that with dosages and things.

Q. What's trituration mean?

A. Finding the right dosage. You have to wait longer periods of time before you can go up on the dose versus for the bipolar.

Q. Okay. And so but you have seen improvement—

A. Yes. Yes.

Q. —in that period of time? So, again—

A. I'd say six to twelve months in this case. It could be sooner than that, could be longer than that, but probably six to twelve months before you would have a long enough period to say that, you know, she's stable and doing well.

Q. Okay. And is it possible with the treatment of that that she would not be disabled?

A. Yes. There are patients with lupus who aren't disabled.

Q. Okay. And since these are very recently diagnosed and actually treating those two things—

A. Right. Yeah.

Q. —would it be fair to say it's hard to say whether these will be longterm disabilities?

A. At this point, yes, it's hard to say.

Q. Okay. You can say at this time she's disabled, at this minute?

A. Yes.

Q. But you can't say she'll be disabled—

A. A year from now.

Q. —in three months, six months, or a year from now?

A. Right.

*Id.* at 45–46.

 The evidence in the record is undisputed. At the time of trial, Karen was disabled—"incapacitated," using the statutory term—such that she was unable to support herself. She had just begun new treatments for her two disabling conditions, and although her treating physician acknowledged the possibility that the new treatments would enable her to find suitable employment at some point in the future, at the time of his deposition he did not attest that this result was certain to occur. Indeed, he specifically stated that more time was needed to evaluate the efficacy of the new treatments. Based on this record, therefore, the trial court abused its discretion by concluding that Karen's incapacity was finite and certain to be cured within six months of the order. *Cf. Haville v. Haville*, 825 N.E.2d 375, 378 (Ind.2005) (holding that duration of spousal maintenance award is measured by the duration of the period of incapacity and survives the death of the obligor).

We hasten to note that we are not saying as a matter of law that trial courts can never find that a spouse's incapacity will last for a finite period of time. If the logic and effect of the facts and circumstances supports such a conclusion, then the trial court does not abuse its discretion in awarding maintenance accordingly. If, for example, a spouse's treating physician testifies that her broken bones are certain to be healed within six months, then it would not be an abuse of discretion to order maintenance for six months if the trial court finds that the broken bones caused the spouse to be temporarily incapacitated. Here, however, the evidence in the record did not support such a conclusion. Consequently, we find that the trial court abused its discretion by limiting Karen's spousal maintenance award to six months.[1]

 Karen also argues that the trial court erroneously awarded her only $200 per week in spousal maintenance, though she does not state how much she believes she is entitled to receive. At the hearing, Karen requested $3,035 per month, although she acknowledged that this amount is greater than Charles's take-home pay. Tr. p. 65–66. Given that after taking his regular expenses into account, Charles's average weekly take-home pay was $550, that he continued to pay the parties' debts and paid for a majority of Karen's living expenses during the dissolution proceedings, that he assumed $126,000 in debt during the pendency of the proceedings, and that he was forced to move in with his parents because he could not afford to live by himself, we cannot say that the trial court abused its discretion in awarding Karen spousal maintenance in the amount of $200 per week.[2]

---

1. Charles, of course, is free at any time to seek a modification of the spousal maintenance award if he believes that Karen is no longer incapacitated. *See In re Marriage of Erwin*, 840 N.E.2d 385, 389 (Ind.Ct.App. 2006) (holding that a trial court has broad discretion to modify a spousal maintenance award).

2. We also note, as did the trial court, that if Karen is totally and permanently disabled as

## II. Division of the Marital Estate

Karen next argues that the trial court erroneously divided the marital estate. Specifically, she contends that the trial court erred by crediting Charles for the parties' debts to his parents and uncle, valuing the marital residence at $72,000, and awarding Karen 54% of the marital estate.

■■■ As we consider these arguments, we observe that the division of marital assets is a matter within the sound discretion of the trial court. *Hyde v. Hyde*, 751 N.E.2d 761, 765 (Ind.Ct.App.2001). The party challenging the trial court's property division bears the burden of proof, and must overcome a strong presumption that the court complied with the statute and considered the evidence on each of the statutory factors. *Id.* Indeed, the presumption that the trial court correctly followed the law and made all proper considerations in dividing the marital estate is one of the strongest presumptions on appeal. *Id.* Thus, we will reverse only if there is no rational basis for the award. Although the circumstances may have justified a different property distribution, we may not substitute our judgment for that of the trial court. *Id.*

■■■ Turning first to the division of specific items in the marital estate, Karen

argues that the trial court erroneously determined that a $4,000 debt owed to Charles's uncle and a $3,500 debt owed to Charles's parents were marital debts and then credited those debts to Charles. Essentially, Karen argues that there is no evidence in the record establishing that Charles's uncle and parents expect the debts to be repaid and that the monies should be treated as gifts rather than loans. To the contrary, however, Charles testified that the monies owed to his uncle and parents were, in fact, debts, that he intended to repay the loans, and that he had even given his parents his guns as collateral for the loans. Tr. p. 12–13, 116, 121–22. Thus, there is evidence in the record supporting the trial court's conclusion that Charles should be credited for these debts and Karen's argument to the contrary is an invitation to reweigh the evidence and judge the credibility of witnesses—an invitation we decline.

■■■ Next, Karen argues that the trial court erroneously valued the marital residence at $72,000 because, although the home was originally appraised at $72,000, the condition of the residence had deteriorated markedly since the appraisal. Karen, however, testified only that she believed that the home was worth "less than that" but neglected to state what she believed the value of the residence to be. *Id.*

---

she claims and as the evidence in the record tends to suggest, she is entitled to Social Security disability benefits, which will enable her to pay her bills. Appellant's App. p. 81.

A trial court could properly consider a spouse's possible eligibility for Social Security disability benefits in determining whether maintenance is warranted. Specifically, if it is clear that the need for maintenance is offset by a program such as Social Security, then it may be that maintenance is not justified. Moreover, it would not be just to permit a party to delay applying for such benefits based on financial comfort stemming from the maintenance payments.

Thus, if there is evidence in the record establishing that a party is eligible for Social Security disability benefits or other government assistance but has not applied for those benefits and there is also evidence establishing a reasonable length of time between application for and receipt of those benefits, it may be that under those circumstances, the trial court could properly award maintenance for a finite amount of time, affording sufficient time for the disabled spouse to begin receiving the government benefits before the maintenance payments cease. Here, there was no such evidence in the record.

at 37. Consequently, Karen may not now complain that the evidence of the home's value is inaccurate. *See Church v. Church,* 424 N.E.2d 1078, 1081 (Ind.Ct.App.1981) (holding that a party who fails to introduce evidence of the specific value of the marital residence is estopped from appealing the distribution based on that absence of evidence). Inasmuch as the trial court's valuation of the residence at $72,000 is supported by the only appraisal or valuation of the home in the record, we decline to find that the trial court abused its discretion in this regard.

Finally, Karen argues that she should have received more than 54% of the marital estate, though she does not state what percentage she believes she is entitled to receive. In particular, Karen points to the fact that Charles earns approximately $70,000 per year and lives with his parents while she is incapable of supporting herself because of her medical conditions. As noted above, however, during the pendency of the dissolution proceedings, Charles continued to pay the parties' debts—including the first and second mortgages on the marital home—and paid for a majority of Karen's living expenses. Additionally, after taking all of his regular expenses into account, Charles's weekly take-home pay is $550, $200 of which is dedicated to spousal maintenance. The trial court's decree of dissolution includes an admirably thorough, careful, three-page list and division of the marital assets. Under these circumstances, we cannot conclude that it abused its discretion in awarding Karen 54% of the marital estate.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to amend the decree of dissolution to reflect that Karen is entitled to receive spousal maintenance for an indefinite period of time.

BAILEY, J., concurs.

VAIDIK, J., concurs in result.